UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES WEBB,

               Plaintiff,                    Case No. 05-71619

vs.

                                    HONORABLE DENISE PAGE HOOD

JO ANNE B. BARNHART,           HONORABLE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION**

I.      **BACKGROUND**

      James Webb brought this action under 42 U.S.C. § 405(g) and § 1383 to challenge a final

decision of the Commissioner denying his application for Supplemental Security Income (SSI) under

Title XVI of the Social Security Act.  Both parties have filed motions for summary judgment which

have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

For the following reasons, IT IS RECOMMENDED that Plaintiff's motion for summary judgment be

DENIED and Defendant's motion for summary judgment be GRANTED.

      A.     **Procedural History**

      Plaintiff originally filed this application for SSI on December 28, 2002, claiming disability

since June 1, 1999, due to "back pain, hip, foot and weight"  (R. 56-58, 69).[1]  Plaintiff's claim was

denied on April 6, 2004, after a December 15, 2003, hearing by Administrative Law Judge (ALJ)

---

[1]Plaintiff had previously filed several applications for SSI (R. 15).  His July 1, 1993 application was granted and he was awarded benefits on July 1, 1993.  The payments were terminated in October 1998.  Plaintiff filed two more unsuccessful applications for SSI on February 25, 1999, and April 2000.  These decisions are not disputed in the present case.

John A. Ransom (R. 15-23).  The Appeals Council declined review on March 9, 2005 (R. 4-8).

B.     **Background Facts**

1.     ***Plaintiff's Hearing Testimony***

Plaintiff was born on April 23, 1955, and was 48 years old at his December 2003 hearing (R. 256).  He finished eleventh grade and served five months in the Marine Corps before being honorably discharged (R. 256-57).[2]  Plaintiff is right-handed, 6'3" tall and weighed 350 pounds.

He thought he had last worked in June of 1998.  After being laid-off he was unable to return to work because he injured his heel.  He felt he could no longer work  because he was unable to lift anything over 10-15 pounds due to conditions in his left heel and hip (R. 258).  He took daily medications for these conditions and had no energy.  He lived with a male roommate who was unable to help around the house (R. 264).  His relatives took care of yardwork, housework and took him grocery shopping (R. 258-59).  He went to church on Sundays if the pastor took him.

Plaintiff did not have a drivers licence for the past three years (R. 259-60).  He had a hard time sleeping at night, getting only 1 ½ - 3 hours (R. 260).  He laid down on the couch during the day, but was unable to sleep.  He could not sit for more than 1 hour nor stand in one position for more than 5 or 10 minutes.  He had been using a cane for 4 years, which had been prescribed by Dr. Cadoney (R. 261).  Without the cane he would fall while walking.  When asked how far he could walk, he responded that he walked about six trailers down.  He could lift 10-15 pounds.  He could not bend or squat.  He had difficulty going up and down stairs (R. 262).  Lying down alleviated  his pain, and he estimated that he spent 6 hours each day between 8:00 am and 5:00 p.m. lying down.  He could not push a vacuum cleaner, but had no problems reaching overhead.  He had trouble using

_____

[2]Plaintiff testified he was unable to complete a pull-up and was released from duty.

2

hands for things liking unscrewing lids because he could not get a grip (R. 262-63).

Plaintiff saw a therapist once a month (R. 263). The therapist also came to check on him periodically to "make sure [he's] doing okay". He had difficulty trying to remember and concentrate on things (R. 263-64). He had previously been receiving Social Security benefits, but then went back to work (R. 264). At the time of the hearing, he received $264 cash and $140 in foodstamps each month from FIA.

### 2. _Testimony from Plaintiff's Case Manager_

Lori Birmingham of TTI, which contracts through Community Mental Health, was Plaintiff's case manager (R. 265). She visited him a couple of times each month. As his case manager she made sure he attended his psychiatrist appointments, linked him with community resources, assisted him with his Medicaid and state disability claims, made sure he attended appointments and assisted him with transportation. She testified that his psychiatrist gave Plaintiff a GAF of 35 on his last visit.[3] In her personal dealings with Plaintiff she felt that his GAF was never higher than 35 and that the diagnosis of schizoaffective disorder was more prevalent than the previously diagnosed bipolar disorder (R. 267).

---

[3]The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). _See id._ at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." _Id_. A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." _Id_. A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. _Id_.

3

3.    *Medical Evidence*

March 15, 1999, left foot and chest x-rays were normal (R. 98-99).

A May 20, 1999, CT of the facial bones revealed a 1 centimeter polyp or cyst in the posterior aspect of the right maxillary sinus with no fluid levels and open ostiomeatal complexes bilaterally (R. 95). An lumber spine x-ray indicated very early degenerative changes in the lumbar spine, with maintained lumbar vertebral heights and satisfactory alignment, intact pedicles and no evidence of spondylilysis or spondylolisthesis (R. 97).

On July 12, 1999, Nasir Ahmad, M.D., evaluated Plaintiff for a sinus problem that had lasted eight months (R. 100). The examination was normal and Dr. Ahmad determined that Plaintiff's pain could not be sinus related but could be migraine.

Dr. Afewroki Kidane, D.O., examined Plaintiff on August 12, 1999, for complaints of daily headache for 7 weeks, ear pain and heel pain causing inability to walk. The exam revealed tender sinuses, left heel and L5-S1 paravertebrae and obesity (R. 138). Dr. Kidane's impression was chronic back pain with osteoarthritis, sinusitis, headache, obesity and left heel pain. He prescribed Relafen and 15 minutes of daily aerobic exercise and referred Plaintiff to neurology.

A September 2, 1999, lower extremity EMG performed by Nael Tarakji M.D., was normal (R. 101). There was no electrodiagnostic evidence of lumbosacral radiculopathy, plexopathy, diffuse peripheral neuropathy or mononeuropathy. Dr. Tarakji's diagnosis was chronic back pain which could be secondary to degenerative lumbar spine disease without evidence of radiculopathy and nonvascular headache (R. 102). Upon physical examination Dr. Tarakji noted Plaintiff to be alert and orientated times three with normal mentation and cognition and central language function. His motor examination revealed normal muscle tone, bulk and strength at 5/5, normal deep tendon

reflexes, no cerebellar dysfunction, normal rapid alternating movements and gait (including tip toe, heel walk and tandem gait) and a grossly intact sensory examination.

A January 18, 2000, examination by Dr. Kidane for complaints of neck pain lasting 2 weeks, congestion, coughing and back pain revealed tender sinuses, posterior neck and L5-S1 paravertebra (R. 137). Dr. Kidane's impression was chronic back pain with osteoarthritis, sinusitis, obesity, allergic rhinistis and GERD. He prescribed Relafen, Darvocet, Augmentin and 15 minutes of daily aerobic exercise with a follow-up visit in 8 weeks.

On February 1, 2000, Plaintiff complained to Dr. Kidane of neck pain (R. 136). Upon physical examination Dr. Kidane found tenderness in the posterior neck and sinuses with full range of motion. He ordered a cervical spine x-ray and prescribed Relafen, Allegra, 15 minutes of daily aerobic exercise and a follow-up visit in 2 weeks.

At the February 17, 2000, follow-up Plaintiff complained of left knee and neck pain that was not relieved with pain medication (R. 135). Plaintiff wanted to try Motrin. Upon physical examination Dr. Kidane found tenderness in the posterior neck and sinuses with full range of motion and tenderness in the left knee without swelling. He ordered a left knee x-ray and prescribed Motrin and Tylenol #3 along with 15 minutes of daily aerobic exercise and a follow-up exam in 4 weeks.

The February 24, 2000, left knee x-ray revealed mild osteoarthritis, with minimal osteoarthritic changes at the left knee and at the left patellofemoral articulation (R. 105).

On March 15, 2000, Dr. Kidane's physical examination revealed Plaintiff's neck to be highly tender posteriorly with full range of motion and his left knee and heel were tender with no swelling (R. 134). Dr. Kidane opined that Plaintiff had chronic back pain due to osteoarthritis, sinusitis, heel spur, obesity, allergic rhinistis, GERD and left knee pain. He prescribed a regular diet, 15 minutes

5

of daily aerobic exercise, Celebrex, Elevil, Reglan and Norvasc with a follow-up exam in 4 weeks. Dr. Kidane rescheduled the March 15, 2000, appointment with neurology that Plaintiff had failed to attend.

When screened for services at Training and Treatment Innovations on May 1, 2000, Plaintiff complaining of overwhelming anxiousness, difficulty coping and mental anguish from his many health problems (R. 243). He explained that he was seeking financial assistance from FIA because he was unable to sustain gainful employment. Carol Fullerby, R.N., described Plaintiff as oriented times 3, distractable with difficulty sustaining attention, possessing a logical/coherent/age appropriate thought process, with normal judgment and impulse control (R. 244). His mood was anxious and his affect was easily confused. Plaintiff was not suicidal or homicidal and had no history of suicidal thoughts or attempts and was not experiencing command hallucinations. Nurse Fullerby diagnosed Plaintiff with Axis I - adjustment disorder with anxiety and depression, rule out dysthimia, Axis IV - lack of primary support, occupational, economic and Axis V- GAF 50.[4] Plaintiff's Functional Assessment Scale was measured at that time and he was determined to have mild limitations in activities of daily living (hygiene was singled out) and moderate limitations in interpersonal functioning, concentration/attention/pace, and adaptation to change (R. 245). Plaintiff was described as having a mental illness but not disabled. Plaintiff was discharged from Training and Treatment Innovations on April 26, 2001, by Dr. Goldner with a diagnosis of Axis I - auditory

---

[4]A GAF of 50-41 indicates serious symptoms OR any serious impairment in social, occupational, or school functioning. http://en.wikipedia.org/wiki/Global_Assessment _of_Functioning.

hallucination psychosis and Axis V - GAF 60.[5]

On January 16, 2001, Plaintiff again visited Dr. Kidane complaining of right elbow and back pain and swelling after a fall (R. 129, 216).  Physical examination revealed tenderness at the L4-5 paravertebral area with decreased flexion, right heel tenderness and mild swelling and tenderness in the right elbow with full range of motion.  Dr. Kidane prescribed 15 minutes of daily aerobic exercise and Celebrex with a follow-up exam in 2 weeks.  Plaintiff did not appear for his January 23, 2001, appointment (R. 129).

January 18, 2001, x-rays of the lumbosacral spine, left hip and right elbow were normal, with the exception of an unremarkable small spur at the anterior superior portion of L4 (R. 103, 228).

On March 5, 2001, Plaintiff complained to Dr. Kidane of shortness of breath, backache and pain in his feet (R. 127, 214).  Plaintiff requested a referral to podiatry so that he could get a steroid injection for his heel spur.  Plaintiff was pleased with the results he received from Darvocet.  Dr. Kidane's impression was that Plaintiff had back pain and left heel spur pain and he prescribed Darvocet, Mobic and a 3 month follow-up exam (R. 128).

At the June 15, 2001, follow-up exam Plaintiff complained of pain in his left knee and right heel (R. 122, 210, 212).  He had a heel spur and had seen a podiatrist for injections which did not help.  He requested another podiatry referral.  Plaintiff stated that he was always in pain and the prescribed medication did not help.  Dr. Kidane noted that Plaintiff continued to gain weight despite his morbid obesity.  Dr. Kidane described Plaintiff's appearance as poor and found all four limbs intact although Plaintiff walked with a cane.  His knees were not swollen but his left knee was

---

[5]A GAF of 60-51 indicates moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

moderately tender on the anterior aspect as was his right heel spur. Dr. Kidane diagnosed sinusitis, osteoarthritis of the knees and lumbar spine and obesity and prescribed Amoxil, Mobic and Darvocet (R. 123).

Dr. Kidane evaluated Plaintiff on January 16, 2002, for complaints of left hip and foot pain (R. 118, 207, 209). Dr. Kidane noted that Plaintiff always complained of severe pain when he came to the office and opined that he probably came to the office not for pain but because his foodstamps were being discontinued and he needed the doctor's office to fill out "two to three weeks of" forms. Physical examination revealed a heel spur and ingrown toenails, tenderness in the left hip with full range of motion, minimal left knee tenderness and morbid obesity. Dr. Kidane diagnosed left hip osteoarthritis and morbid obesity. Dr. Kidane prescribed Darvocet and Naprosyn and referred Plaintiff to podiatry for the heel spur and ingrown toenails.

Gordon R. Forrer, M.D., met with Plaintiff on March 13, 2002, for the purposes of providing a psychiatric evaluation to the Michigan Disability Determination Service (R. 111-116). Plaintiff reported that he was laid off from his job at a machine tool company and never went back to work (R. 112). He had trouble falling asleep for unknown reasons and woke up 2-3 times when he did fall asleep. He had heel spur surgery which was ineffective. He had past alcohol and drug abuse problems. He had never been confined to a mental hospital and was not being treated by a psychiatrist. He had a phobia for heights. Dr. Forrer felt that Plaintiff was not depressed but was unhappy. Plaintiff liked to play cards with friends and acquaintances. He did some household chores and his sister-in-law came and helped him on many occasions. He shopped for food and necessities when required and did minor cooking. He spent his day watching television and playing with toy cars. He had no hobbies or non-work interests (R. 113). Dr. Forrer described Plaintiff's

8

appearance as carelessly dressed with unwashed hands and borderline hygiene.  His mood was neutral with no irritability, hostility or emotional liability and no evasiveness, suspiciousness, guardedness or manipulativeness.  Dr. Forrer described an overall "emptiness" and stated that Plaintiff did not remember past events.  Plaintiff had auditory, visual, olfactory and gustatory hallucinations.  Plaintiff also thought people were trying to harm him and were talking about him, and that the devil was trying to get him to kill people that had "done me wrong" (R. 113-114).  His affect was blunted, limited in range and motility and not entirely appropriate to the circumstances of the moment or his thought content (R. 114).  He had an overall aura of confusion.  He was orientated for time, place and person, but arrived at responses very slowly and by steps.  Dr. Forrer was unable to estimate Plaintiff's IQ, but felt he had limited intellectual endowment.  Plaintiff characterized his memory as 2 on a 10 point scale.  He could recall a 4 digit number forward, but not backward.  He could recall three objects after fifteen minutes.  Dr. Forrer diagnosed Plaintiff has having an Axis II - personality disorder (not otherwise specified) with inadequate and dependant and mildly paranoid positioning in a person with somewhat limited endowment; Axis III - gross obesity, asthma, heel spurs and poor hygiene; Axis IV - stressors from financial problems and Axis V - current level of psychological functioning borderline adequate (R. 115).  Dr. Forrer did not anticipate any changes to Plaintiff's condition within the foreseeable future and felt that he had the capacity to work 40 hours with adequate pacing and concentration without interruption from psychiatric symptomology provided that any job involved very simple repetitive tasks without requiring much judgment or decision making (R. 115-116).

An April 2, 2002, Psychiatric Review Technique form completed by Sydney Joseph, M.D., indicated that a RFC assessment was necessary based on the diagnosis of a personality disorder not

9

otherwise specified as diagnosed by Dr. Forrer (R. 139-146, 151). Dr. Joseph indicated that Plaintiff was functionally limited by his mental disorder as follows: mild restriction in activities of daily living and moderate restrictions in maintaining social functioning and maintaining concentration, persistence or pace (R. 149). In the Mental Residual Functional Capacity Assessment Dr. Joseph indicated that Plaintiff was moderately limited in the ability to: understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without a reasonable number and length of rest periods, interact appropriately with general public, accept instructions and respond appropriately to criticism, get along with coworkers or peers without distracting them, respond appropriately to changes in the work setting, set realistic goals or make independent plans (R. 153-154).

An April 8, 2002, Physical Residual Functional Capacity Assessment was completed by Jeanette Hollingsworth and she found Plaintiff to have the RFC to: occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk 6 hours per 8 hour workday, sit 6 hours per 8 hour workday with unlimited pushing and pulling, no postural or manipulative limitations and no communicative or environmental limitations (R. 158-161). Ms. Hollingsworth found Plaintiff partially credible based on the evidence in the file (R. 162).

During a July 2, 2002, follow-up examination with Dr. Kidane Plaintiff complained of right elbow pain causing an inability to bend the elbow, peeling skin on his right palm and changing skin color on palms, but noted that "knees and other places are relatively okay" (R. 201, 203). Physical examination revealed moderate right elbow tenderness on the anterior, medial and posterior areas, as well as discomfort in range of motion and flexion; dark brown coloration on both palms, more

10

on left; peeling skin with no erythema; slight edema in the lower extremities.  Dr. Kidane's impression was hypertension, chronic joint pain, right heel spur and osteoarthritis of the lumbar spine.  Dr. Kidane increased the prescribed doses of Elavil and Prozac, and continued diltiazem and Darvocet.  He added Lasix, gave Plaintiff a referral to a dermatologist and requested a follow-up exam in 1 week (R. 202).

Plaintiff was seen in Dr. Kidane's office on August 30, 2002, complaining of right elbow pain (R. 197, 199).  Dr. Kidane noted that Plaintiff was last seen in July and was prescribed Lasix for high blood pressure which Plaintiff never filled.  Plaintiff also failed to attend his follow-up examination and did not call to reschedule despite receiving a message from Dr. Kidane's office. Plaintiff reported that he had also missed an appointment with a dermatologist.  Plaintiff explained that his elbow pain had gotten worse because he ran out of his pain medication and that he also wanted a referral to podiatry.  Physical examination revealed moderate tenderness on the right elbow to the wrist with no joint swelling and no erythema, full range of motion with some discomfort on flexion and maximum discomfort on extension.  Dr. Kidane prescribed Lasix; continued Elavil, Prozac diltiazem; Clinoril; Darvocet and weight loss with a prescribed diet and caloric intake regimens, along with a follow-up exam in 1 week (R. 198).

During a September 6, 2002, follow-up examination with Dr. Kidane, Plaintiff requested a referral for arm pain (R. 194,195).  Plaintiff stated that his arm felt better but he still had pain and was not able to extend it.  Physical examination revealed moderate tenderness in the right shoulder and elbow, slightly less than last exam, with stiff range of motion at shoulder and full extension and extension at elbow.  Dr. Kidane increased the prescription for diltiazem, continued Darvocet and Clinoril, ordered a right elbow and shoulder x-ray and a follow-up exam in 2 weeks.

11

The October 7, 2002, right shoulder, elbow and forearm x-rays were normal apart from a small bone density seen at the coronoid process of the ulna which was determined to be from an old chip fracture or soft tissue calcification which was dystrophic in nature with history of no injury (R. 226).

On October 16, 2002, a Michigan Family Independence Agency (FIA) Medical Needs form was completed by an unknown physician who stated that he or she saw Plaintiff on that date and opined that Plaintiff was disabled from work for 12 months due to osteoarthritis of the lumbar spine, hypertension, right heel spur, right forearm pain and obesity (R. 165).

Plaintiff visited Dr. Kidane on October 25, 2002, for a follow-up visit regarding his right arm pain and with a FIA form to be completed (R. 246, 250). Plaintiff indicted that he had run out of his pain medication and had missed an appointment since his last visit. Dr. Kidane noted that the elbow, shoulder and arm x-rays he had ordered had not shown any abnormal findings. Physical examination revealed moderate tenderness on the lateral side of the forearm with no joint swelling and a right heel spur which was tender. Dr. Kidane's impression was that the right shoulder pain had resolved and Plaintiff now had hypertension, morbid obesity, osteoarthritis of the lumbar spine, right heel spur and right elbow and forearm pain. Dr. Kidane prescribed diltiazem, Lasix, Clinoril, Neurontin and Darvocet and requested a 4 week follow-up exam (R. 247).

On December 31, 2002, Plaintiff visited Dr. Kidane complaining of cough, elbow pain and right heel pain (R. 189).

On January 31, 2003, Plaintiff visited Dr. Kidane complaining of flu symptoms (R. 188).

On February 1, 2003, Plaintiff visited Dr. Kidane complaining of cough and chest congestion and heel spur pain (R. 186). Plaintiff reported that he had seen the podiatrist several times and had

12

received injections and pain medications for the heel spur. Physical examination revealed that his left heel was non-tender and right heel was minimally tender with no swelling. Dr. Kidane gave Plaintiff a nebulizer treatment, prescribed Amoxil, Atrovent inhaler, Flovent inhaler, Naprosyn, Allegra and requested a 1 week follow-up visit (R. 187).

Plaintiff was seen at Training and Treatment Innovations on February 14, 2003, by Richard Goldner, M.D., who indicated that Plaintiff was stable and improving (R. 238).

On April 24, 2003, Plaintiff visited Dr. Kidane complaining of cough and chest congestion, at which time Dr. Kidane noted that Plaintiff was last seen in January for bronchitis and sinusitis and had failed to attend his follow-up appointment (R. 183). Physical examination revealed non-tender sinuses with post nasal drainage, clear lungs, non-tender abdomen, moderate tenderness in the left knee with full range of motion with some discomfort. Dr. Kidane prescribed an Atrovent inhaler, Flovent inhaler, Naprosyn, Allegra, Accupril, chest x-ray, nebulizer treatment and a 1 week follow-up examination (R. 184). An April 25, 2003, chest x-ray revealed no gross focal pulmonary infiltrates or pleural effusion, but did reveal some mild degenerative changes described as lower thoracic spondylosis (R. 224).

Plaintiff was seen at Training and Treatment Innovations on May 9, 2003, by Dr. Goldner who indicated that Plaintiff was stable and improving (R. 237).

On August 1, 2003, during an annual psychiatric evaluation Plaintiff reported to Dr. Goldner that he had: pain in both knees and back which kept him restless during the night, variable depression and headaches, hearing voices for the past ten years and he was experiencing a lack of energy and mood swings (R. 231). He had attempted suicide in his teens, been beaten severely on his head in 1994 requiring 144 stitches, was discharged from the Marines after 7 months for a mental

13

condition.  He had finished the 11th grade and was a somewhat excessive social drinker when younger.  Dr. Goldner described Plaintiff as alert, coherent, relevant, orientated man with an average IQ, appropriate mood who was not actively hallucinating or delusional.  Dr. Golder diagnosed Plaintiff with Axis I - bipolar disorder not otherwise specified with psychosis, Axis V - GAF 20.[6] Dr. Goldner prescribed Prozac, Seroquel and Desyrel, requested a follow-up appointment in 3 months and stated that Plaintiff was a "social security candidate".

On September 2, 2003, Plaintiff visited Dr. Kidane complaining of back pain and coughing (R. 178, 181).  His cough had slightly improved but remained a problem (R. 178).  He was also experiencing heartburn and explained that he had been diagnosed with GERD and prescribed Zantac in the past.  Physical examination revealed a lot of post nasal drip, clear lungs, moderate tenderness in left knee with full range of motion with some discomfort.  Dr. Kidane prescribed a breathing treatment, Solu-Medrol, Accupril, Clinoril, Claritin, Zantac, Combivent inhaler, Flovent, Amoxil, Tylenol #3 and a follow-up exam in 1 week (R. 179).

On October 16, 2003, Plaintiff visited Dr. Kidane complaining of persistent cough and pain in both knees (R. 180).

On October 23, 2003, Plaintiff was seen by Janet Warner, M.D., of Training and Treatment Innovations (R. 235).  She indicated that her diagnosis was "unchanged from last review" and gave him a GAF of 30.[7]

---

[6]A GAF of 20-11 indicates some danger or hurting self or others or occasionally fails to maintain minimal personal hygiene or gross impairment in communication.  http://en.wikipedia. org/wiki/Global_Assessment_of_Functioning.

[7]A GAF of 30-21 indicates that behavior is considered influenced by delusions or hallucinations or serious impairment in communications or judgment or inability to function in all areas.

On October 28, 2003, Plaintiff visited Dr. Kidane complaining of knee pain and requesting "paperwork" (R. 176, 230).  Dr. Kidane reported that Plaintiff's coughing condition and back were much better and Plaintiff had seen a psychiatric counselor who prescribed Wellbutrin and Sinequan. Physical examination revealed less tender sinuses than previously noted and moderate tenderness in his back.  Dr. Kidane prescribed a Combivent inhaler, Flovent, Clinoril, Claritin, Accupril, Zantac, Tylenol #3; referred him for a sleep study and requested a follow-up exam in 8 weeks (R. 177).

On November 20, 2003, Plaintiff visited Dr. Warner and complained that he could not sleep well and was awaiting a sleep apnea test (R. 232).  Dr. Warner found Plaintiff to be alert and orientated times 3, disheveled, pleasant, cooperative, with fair eye contact and low energy; speaking at a regular rate, rhythm and syntax; with blunted affect, dysphoric mood that he ranked 5/10.  He denied suicidal ideations, described his sleep as poor (only 1 hour per night) and was positive for auditory hallucinations.  His thought process was logical, coherent and goal directed and his cognition/comprehension/concentration was within normal limits.  His immediate, short and long term memory was intact and his intellect was within normal limits, but his judgment was impaired. Dr. Warner diagnosed Plaintiff with Axis I - schizoaffective disporder - depressed and Axis V - GAF 35.

    **4.**    ***Vocational Evidence***

ALJ Ransom asked vocational expert (VE) Judith K. Findora to consider whether Plaintiff would be able to perform his past work if one assumed that he was 48 years old, had the past work

---

http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

history as it appeared in the record, had the limitations and impairments he alleged and his testimony was credible (R. 268). VE Findora responded that he would not be able to perform his past work due to the limitations on lifting, sitting, standing and walking, as well as his need to lie down 6 of 8 hours each day.

ALJ Ransom asked VE Findora if there were a significant number of jobs Plaintiff could perform if one assumed that he could perform: sedentary work with a sit/stand option; no repetitive bending, twisting or turning; no crawling, squatting, kneeling or climbing; no repetitive pushing, pulling, gripping or grasping; with a clean air environment; and with simple repetitive work with limited contact with the public and coworkers (R. 268-69). VE Findora stated he would be able to perform the following jobs that were available in the regional economy in the indicated quantities: 1,575 surveillance monitor positions, 2,000 administrative support positions, 1,050 sorter positions and 4,000 general office clerk positions (R. 269).

Plaintiff's counsel asked whether a complete limitation on contact with the public and coworkers would effect the number of available jobs and VE Findora explained that this limitation would preclude all employment.

When questioned by Plaintiff's counsel VE Findora explained that the level of handling, fingering and feeling required for the jobs she listed would be "none" for the surveillance positions and "frequently" for the remaining positions. When asked how long a person employed in these positions would have to focus on the tasks in order to remain employed, VE Findora explained that "if you're unable to stay on task to even do simple repetitive jobs, then you would not be able to do these. These jobs do not require concentration, they don't require thought, they require more rote action" (R. 270).

ALJ Ransom then asked if there were jobs in existence in significant numbers in the regional economy that Plaintiff could perform if one assumed that he had the RFC to perform the following: light work with no repetitive bending, twisting, or turning, crawling, squatting, kneeling, or climbing and limited contact with the public and coworkers, simple repetitive and clean environment (R. 271). VE Findora testified that there would be 10,000 housekeeping positions, 2,000 sorter positions, 5,000 general clerical positions and 4,000 file clerk positions (R. 272). VE Findora explained in response to a question from Plaintiff's counsel that these positions required frequent handling, fingering and feeling, and that a sit/stand option would preclude the housekeeping position and reduce the sorter positions to 1,500.

### 5.   *The ALJ's Decision*

Plaintiff had a combination of impairments that were considered severe based on the requirements of 20 C.F.R. § 416.920(b) (R.22). Those impairments being: chronic left hip and low back pain without evidence of radiculopathy, osteoarthritis in the left knee, obesity, personality disorder not otherwise specified, auditory hallucination psychosis not otherwise specified, borderline intellectual functioning, a right heel spur and left elbow and shoulder pain. The impairments were collectively severe, within the meaning of the Regulations, but not sufficiently severe to meet or medically equal the criteria of any impairment set forth in the Medical Listings; Appendix 1, Subpart P, Part 404 of Regulations (20 C.F.R. 404 1520(d)) (the "Listing").

Plaintiff's allegations regarding his limitations were not fully credible because they were inconsistent with the objective medical evidence, absence of more aggressive treatment and Plaintiff's ordinary activities (R. 20). ALJ Ransom noted that Plaintiff's impairments did not require surgical intervention; that Plaintiff had no psychological counseling; a February 2000 x-ray showed

17

that his osteoarthritis was mild; x-rays of his low-back, left hip and right elbow were negative; the pain in his right shoulder was documented has having been resolved in October 2002; his April 26, 2001 GAF was 60 and a September 2, 1999, EMG showed no evidence of lumbrosacral radiculopathy, plexopathy or neuropathy in the lower extremities.

No period of 12 consecutive months has elapsed during which Plaintiff lacked the RFC to perform: light work as defined in 20 C.F.R. sec 416.967 that involves no repetitive bending, twisting or turning, no crawling, squatting, kneeling or climbing, limited contact with the general public and co-workers and simple repetitive work tasks that are performed in a clean air environment with no repetitive pushing, pulling, gripping or grasping and a sit/stand option (R. 22-23).

Plaintiff was unable to perform his past relevant work and had no skills which were transferrable to jobs within his RFC (R. 23).  Using the Medical-Vocational Guidelines as a framework ALJ Ransom determined that Plaintiff could perform a significant number of jobs in the economy, referring to the limited number of sedentary and light jobs identified by VE Findora, and Plaintiff was, therefore, not disabled.

## II.   ANALYSIS

### A.   Standards Of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co.*

*v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely

because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*,

physical examination 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147,

1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than his past

work, the testimony must be given in response to a hypothetical question that accurately describes

Plaintiff in all significant, relevant respects.[8] A response to a flawed hypothetical question is not

substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.    Factual Analysis**

Plaintiff raises two challenges to the Commissioner's decision, both of which allege that ALJ

Ransom could not rely on VE Fidora's testimony as substantial evidence that there are a significant

number of jobs in the economy that Plaintiff could perform because: (1) the RFC ALJ Ransom set

forth in his opinion was different than the RFC scenarios he presented to VE Findora and (2) the RFCs

presented to VE Findora failed to adequately encompass Plaintiff's limitations in concentration,

persistence or pace.

**1.    *Discrepancy Between Question Posed to VE Findora and RFC in Opinion***

---

[8] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

19

Plaintiff argues that the questions ALJ Ransom posed to VE Findora did not include all of the limitations he ultimately found Plaintiff to have in the RFC he included in his opinion.

ALJ Ransom initially asked VE Findora whether there were jobs Plaintiff could perform if he were restricted to sedentary work with the following limitations:

- a sit/stand option;
- no repetitive bending, twisting or turning;
- no crawling, squatting, kneeling or climbing;
- no repetitive pushing, pulling, gripping or grasping;
- a clean air environment; and
- only simple repetitive work with limited contact with the public and coworkers

(R. 268-69)(Sedentary Hypothetical).

VE Findora stated he would be able to perform the following jobs that were available in the regional economy in the indicated quantities: 1,575 surveillance monitor positions, 2,000 administrative support positions, 1,050 sorter positions and 4,000 general office clerk positions (R. 269). VE Findora explained that the level of handling, fingering and feeling required for the jobs she listed would be "none" for the surveillance positions and "frequently" for the remaining positions.

ALJ Ransom later asked if there were jobs in existence in significant numbers in the regional economy that Plaintiff could perform if one assumed that he had the RFC to perform light work with the following limitations:

- no repetitive bending, twisting, or turning, crawling, squatting, kneeling, or climbing,
- limited contact with the public and coworkers,
- simple repetitive work and
- clean environment

(R. 271)(Light Hypothetical).

VE Findora testified that there would be 10,000 housekeeping positions, 2,000 sorter positions, 5,000 general clerical positions and 4,000 file clerk positions (R. 272). VE Findora explained in

20

response to a question from Plaintiff's counsel that these positions all required frequent handling,

fingering and feeling, and that a sit/stand option would preclude the housekeeping position and reduce

the sorter positions to 1,500.

In his opinion ALJ Ransom found that Plaintiff had the RFC for *light* work with all of the

limitations he had set forth in the Sedentary Hypothetical (R. 22-23). ALJ Ransom then found that

Plaintiff could perform all of the jobs about which VE Findora had testified in response to both the

Sedentary and Light Hypotheticals. Plaintiff's argument against ALJ Ransom relying on all of these

jobs is essentially that the Light Hypothetical posed to VE Findora did not include the limitations for

(1) "no crawling, squatting, kneeling or climbing" (it only limited these actions to not being repetitive)

or (2) "no repetitive pushing, pulling, gripping or grasping". Therefore, Plaintiff argues, because ALJ

Ransom ultimately included these limitations in his RFC, the number of jobs that VE Findora

suggested were available in the light category (a.) must all be eliminated or (b.) may need to be

reduced with the addition of these limitations.

In support of his argument that the light category jobs must all be eliminated Plaintiff relies on

the fact that VE Findora testified that all of the light jobs required "frequent" handling, fingering or

feeling, a requirement that Plaintiff argues is directly contraindicated by the "no repetitive pushing,

pulling, gripping or grasping" limitation. Yet, the Sedentary Hypothetical did specifically include the

limitation against "repetitive pushing, pulling, gripping or grasping" and VE Findora testified that

almost all of the sedentary jobs she identified required "frequent" handling, fingering or feeling as well

(R. 269). Therefore, it appears that these two limitations are not identical in VE Findora's opinion and

that "frequent" hand use is less than "repetitive...gripping or grasping." If Plaintiff's counsel thought

VE Findora was contradicting herself on the Sedentary Hypothetical responses, further questioning

21

might have clarified her reasoning.  At most the 1,050 sorting jobs might be affected.  Further, while the record includes some evidence of elbow pain, peeling skin on the right palm, and Plaintiff's use of a cane to walk, Plaintiff has not actually argued that he is limited in the use of his hands or pointed to any evidence in the record to support a conclusion that he should be restricted from frequent handling, fingering or feeling - instead relying on the apparent discrepancy between the RFC in the opinion and the hypotheticals to support his request for a remand.

Plaintiff also points out that ALJ Ransom failed to take into consideration that VE Findora testified that a sit/stand option would reduce the available light category jobs by eliminating the 10,000 housekeeper positions and reducing the sorter positions to 1,500.  Plaintiff is correct that ALJ Ransom included a sit/stand option in finding #6 (R. 23).  Yet, there would still be a substantial number of light jobs even with this reduction (1,500 sorter positions, 5,000 general clerical positions and 4,000 file clerk positions (R. 272)).  Therefore, this error is not adequate support for the elimination of the light category of jobs or a remand for redetermination.

As for Plaintiff's argument in the alternative - that the Court should remand the matter for further VE testimony - this argument must fail as well.  The only purpose for remanding to gather further VE testimony would be determine by how much the *light* category of jobs would be reduced if the limitations of "no crawling, squatting, kneeling or climbing" and "no repetitive pushing, pulling, gripping or grasping" were added to the Light Hypothetical.  Having eliminated the housekeeping and certain sorter jobs, the total ban on crawling, squatting, kneeling or climbing would likely have little effect on the remaining 10,500 sorter, clerical and file clerk positions that did not involve repetitive crawling, squatting, kneeling or climbing.  Nor is the inclusion of "no repetitive pushing, pulling, gripping or grasping" at the light level likely to have much of an impact in light of VE Findora's

testimony that 1,050 sorting and 4,000 general office clerk jobs could be performed at the sedentary level with these restrictions on "pushing, pulling, gripping or gasping."  Thus it is doubtful that the addition of these limitations to the Light Hypothetical would reduce the remaining 10,500 light jobs about which VE Findora testified (after eliminating the jobs precluded by the sit/stand option) to a non-significant number, especially when added to the thousands of available sedentary jobs.  VE Findora's testimony regarding the availability of a significant number of sedentary jobs that Plaintiff can perform remains undisputed.  Therefore, remanding for a determination of the number of light jobs that are available to Plaintiff would be an exercise in futility, because even if the light jobs were totally eliminated in this manner there still would have been testimony regarding the availability of a significant number of sedentary jobs in the economy that Plaintiff could perform that would support ALJ Ransom's finding that Plaintiff is not disabled.

Plaintiff's argument that he would be entitled to a finding of disability pursuant to the "Grid Rulings" as of his 50th birthday if all the light jobs were eliminated is not properly before this Court. Plaintiff turned 50 years old on April 23, 2005 - more than a year after the April 6, 2004, opinion in this matter.   If Plaintiff wishes to seek disability benefits under the grid after he turned 50, he may reapply.  The Court may only review the administrative record to determine if the Commissioner's ruling was supported by substantial evidence, and it may not conduct a *de novo* review.  *Price v. Secretary of Health & Human Services*, 831 F.2d 296, (6th Cir.1987)("By considering appellee's age afresh ... the magistrate went beyond the record before him and engaged in impermissible *de novo* factfinding and review.").  Because it is undisputed that Plaintiff was a "younger individual", defined in 20 C.F.R. § 416.963 as aged 18-49,  at the time of the hearing in this matter, ALJ Ransom would not have been required to make a finding of disability if it had been determined that Plaintiff was only

able to perform sedentary work.  Therefore, this Court may not use the fact that Plaintiff as since turned 50 years old to order a remand.

Therefore, Plaintiff's argument that the discrepancy in the hypothetical RFCs when compared to the RFC in ALJ Ransom's opinion is sufficient cause for a determination of benefits or remand should be dismissed.

### 2.      Failure to Include Limitations of Concentration, Persistence or Pace in Hypothetical

It is undisputed that Plaintiff has mental limitations.  ALJ Ransom found Plaintiff to have impairments including: personality disorder not otherwise specified, auditory hallucination psychosis not otherwise specified and borderline intellectual functioning (R. 22).  ALJ Ransom asked VE Findora to assume that Plaintiff could perform only simple repetitive work tasks (R. 268, 271).  Plaintiff argues that these limitations are insufficient to fully describe his mental limitations given that ALJ Ransom "opined" that Plaintiff was "moderately restricted" in his ability to "maintain concentration, persistence or pace" (Dkt. # 10, p. 10; referring to ALJ's opinion at R. 19).[9]  Plaintiff disputes the way in which ALJ Ransom incorporated the mental impairments into the hypotheticals proposed to VE Findora, but not the nature or scope of the limitations ALJ Ransom found.

When an ALJ makes a finding that a claimant has moderate restrictions in the category of "concentration, persistence or pace", but does not specifically include that limitation in the hypothetical question, "the question is whether the ALJ used adequate alternate concrete job restrictions in the hypothetical question that suitably accommodated the worker's concentration

---

[9]It should be noted that "concentration, persistence or pace" is a category prescribed by the Regulations under which a claimant's functional limitations must be evaluated but only requires the PRTF form to be used at the initial and reconsideration levels.  20 C.F.R. § 416.920a.

limitations." *See Edwards v. Barnhart*, 383 F.Supp.2d 920, 930 (E.D. Mich., 2005).

In the case cited by Plaintiff, *Bankson v. Commissioner*, 127 F. Supp. 2d 820 (E.D. Mich. 2000), the Court noted that it was reasonable to conclude under the regulations "that a mental deficiency occurring 'often' may not be consistent with substantial gainful employment." *Id.* at 826. The Court then determined that under the relevant portion of the Psychiatric Review Technique Form (PRTF), "often" should logically be defined as fifty percent of the time. *Id.* at 827. In *Bankston*, the finding that the claimant often had deficiencies of concentration, paired with the uncontested findings of the treating physician that he was disabled, resulted in a finding of disability and a remand for award of benefits. Yet, in *Bankston*, unlike the present case, the ALJ adopted the "often" finding in his PRTF. Here, ALJ Ransom did not complete a PRTF, but used the Commissioner's new regulations finding Plaintiff to be limited in the "concentration, persistence or pace" category at a moderate rate–the midpoint of the five possible selections of none, mild, moderate, marked or extreme.

Although the *Bankston* decision cited by Plainitff has been questioned, and may be mooted by a change in regulations that were applied in the present case, it does correctly note that a hypothetical question must consider the severity, including the degree and/or frequency, of the claimant's concentration problems.

There seem to be two components to having problems in concentration - whether characterized as being "often" or "moderate." One deals with the frequency of how often one cannot concentrate. The other deals with the level of sophistication or intensity of the work that can be done with the concentration limitation. The hypothetical question asked by the ALJ encompasses the later effects of concentration problems by limiting Plaintiff to only simple repetitive tasks, but does not seem to specifically address the frequency of how often that worker would be unable to concentrate.

25

Yet, VE Findora, while acknowledging an inability to "stay on task" would preclude even simple repetitive jobs, testified that none of the sedentary jobs about which she testified required concentration or even thought, she stated that "they require more rote action" (R. 270). Further, nothing in the Record indicates that any treator or evaluator suggested that Plaintiff was limited in any greater capacity than the moderate or mid-point limitation that ALJ Ransom indicated.

In the April 2002 mental RFC assessment completed by Dr. Joseph the findings regarding Plaintiff's limitations in concentration, persistence or pace were not explained (R. 153-155). Dr. Joseph simply checked the boxes indicating that Plaintiff was moderately restricted in his ability to: understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without a reasonable number and length of rest periods, and then opined that Plaintiff could "do simple unskilled work" (R. 155). He found no significant limitations in 11 of 20 categories and no "marked" or worse limitations in any category.

Dr. Joseph did not examine Plaintiff and based his PRTF largely on the report of Dr. Forrer, who did examine Plaintiff on March 13, 2002 (R. 111-116). Dr. Forrer found that Plaintiff's mental impairments did not disable him from work and concluded that Plaintiff could work 40 hours per week "with adequate pacing and concentration" at a job with simple and repetitive job duties (R. 115).

In a situation such as this, where Dr. Forrer provided a detailed and complete explanation of his opinion that Plaintiff had adequate capacity to perform a simple job, where there is no treating source indicating otherwise, where Plaintiff had worked several years as a machine operator - which ended because of a lay off and not any physical or psychiatric problem - and where the VE noted little

26

concentration was needed in the simple repetitive jobs identified, this case is distinguishable from *Bankston*. It is more closely analogous to *Smith v. Halter*, 307 F.3d 377 (6th Cir. 2001), where the Court found the hypothetical adequate even though it did not specifically include the moderate limitations of concentration, persistence or pace. On these facts ALJ Ransom's hypothetical question was adequate and his ultimate finding is supported by the opinion of Dr. Forrer and the testimony of VE Findora.

## III.    RECOMMENDATION

For the reasons stated above, IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

27

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 3, 2006                          s/Steven D. Pepe
Ann Arbor, Michigan                           United States Magistrate Judge

Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on March 03, 2006.

                                              s/William J. Barkholz
                                              Courtroom Deputy Clerk

28